UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID WARDEN                                                CIVIL ACTION
                                                            NO. 06-2302
VERSUS

DANA MARINE SERVICE, INC.                                   SECTION M


ORDER AND REASONS

This is an action by David Warden, a Jones Act seaman, seeking to recover compensatory damages and Maintenance and Cure from his employer, Dana Marine Service, Inc. (Dana Marine) as a result of an alleged incident that occurred on June 3, 2003, aboard the tugboat M/V ATABOY while it was docked in Lake Charles, Louisiana.

This matter came for trial without a jury on October 22 and 23, 2007. After consideration of the evidence, post-trial memoranda and applicable law, the Court finds as follows:

**Findings of Fact:**

Warden, a 56-year-old United States citizen, currently residing in the Philippines, was a licensed chief engineer who had served in the United States Coast Guard and thereafter had worked on several types and sizes of vessels during his maritime career.

In April 2003 Warden was hired by Dana Marine to serve as chief engineer aboard M/V ATABOY at a salary of approximately $90,000 a year. He completed an employment application and met with Charles Lawton, Dana Marine's operations manager, as well as with Eric Dreijer, the owner of Dana Marine. At trial, Warden testified that he reported on his pre-employment application that he suffered from hypertension and diabetes, was on a number of medications, and that he had previous hand, knee and neck surgeries. Warden explained that he did not consider his prior back sprains to be serious. Warden testified that he did not mention, nor was he asked about the mild stroke that he had previously suffered, as he considered that he had fully recovered, except for some limited difficulties with speech.

Dana Marine sent Warden to the Taylor Clinic in Mobile, Alabama where nurse practitioner Barry Gaston performed a pre-employment physical. Warden testified that the examination was cursory, and Gaston spent limited time with Warden before approving him for employment.

Warden went to work aboard M/V ATABOY, allegedly providing Dana Marine with a "laundry list" of alleged deficiencies in the engine room, including the fact that part of the decking in the engine room was plywood in need of replacement. The list was not entered into evidence, and Dana Marine's Lawton and Dreijer deny that they ever received any such list from Warden. Additionally, the engine room logs, for which Warden was responsible for completing as the chief engineer, reflect no problems other than general maintenance. Each Dana Marine employee further testified that the engine room flooring

was entirely constructed of steel with no plywood ever present.  Following the first voyage, M/V ATABOY docked in Lake Charles awaiting it next assignment.  Only Warden and deckhand, Greg Smith, remained aboard to perform necessary maintenance and repair work.

Warden testified that on June 3, 2003, he was working on the "centrifuge unit" on the vessel.  The centrifuge links the vessel's fuel tanks to her twin diesel engines and serves as a filter for impurities.  Warden testified that he was instructed by his superiors at Dana Marine in Mobile to remove the pump and take it to the dealer, Hutchinson Hayes, in Houston, Texas for repair.  Warden testified that he was told by the dealer that the cost of replacing the pump was about the same as the cost of replacing the entire centrifuge, and although he thought this unusual, he testified that Lawton instructed him to remove the old centrifuge and replace it with a rebuilt model from Houston.

Dana Marine alleges that Warden was never instructed to replace the centrifuge, only the pump, and Hutchinson Hayes records indicate that the only part ordered and bought by Dana Marine was a pump.

Warden testified that on the day of the incident in question he prepared the centrifuge to be removed; he drained the fuel and lube oil, took out the "cones" and "internal gears," and removed the pump and electric motor.  Warden testified that he thought the shell or frame of the centrifuge weighed 80 pounds, and he cradled the shell in his arms and turned to place the unit onto the deck.  When he did, some diesel fuel spilled out of the fittings and onto the deck, and Warden testified that he slipped in the fuel

and fell, dropping the unit on his left foot.  He further contended that the flooring that he slipped upon was plywood.

Warden testified that after sitting on the step in the engine room for a few moments, he reported the incident to deckhand Smith in the wheelhouse.  Smith testified that Warden said he slipped in the engine room and Smith called the Dana Marine office in Mobile.  Smith testified that Lawton advised him to take Warden for treatment in Lake Charles, where Warden was allegedly diagnosed with a left foot fracture, and the physician there advised Warden to see an orthopedist.  Smith took Warden back to the vessel and while Warden was getting his things together, Smith testified that he observed parts from the centrifuge laid out in the engine room.  He testified that there was plywood decking in the walkway with some diesel fuel on it but could not confirm the location of the centrifuge.

Dana Marine introduced a Hutchinson Hayes technical data sheet stating that the net weight of the centrifuge is 390 pounds and that the gross weight is 620 pounds.  Dana Marine's chief engineer Don Burnham testified that the number on the existing centrifuge matched the number on the centrifuge purchased and installed in 1999.  Other Dana Marine employees including Dreijuer testified that the centrifuge in photographs taken in 2006 was a photograph of the centrifuge installed in 1999.  Further testimony indicated that the centrifuge was never removed nor had it been replaced.   Dana Marine's witnesses testified that there was never plywood decking in the engine room.

After the incident, Warden visited his daughter's home in south Florida and at that time saw Dr. Francisco Noda, an orthopedist.  Dr. Noda concluded that Warden's injuries

4

had exacerbated his "Charcot joint," a degenerative condition, probably related to his underlying diabetes. The doctor advised Warden that he needed to wear a protective boot. Dr. Noda released Warden to travel to the Philippines, with the understanding that he would seek and receive treatment there. In the Philippines Warden sought treatment from Dr. Alex Duque, an orthopedic surgeon who found that Warden's condition had deteriorated and recommended surgery to fuse the joints in his foot. This surgery was not performed, and Warden returned to south Florida for further treatment from Dr. Victor McNamara, a podiatrist in Orlando. Dr. McNamara treated Warden for infections in his foot for several months. At that time, Dr. McNamara reported that the ulceration of the planar left arch had healed and that Dr. John Bazata, a podiatric surgeon, who had also treated plaintiff, would continue to treat his Charcot joint, as well as the deformity of the foot and leg. Warden remained under Dr. Bazata's care through April 24, 2006, when Dr. Bazata stated that, "Mr. David Warden was seen in the office on 04-24-2006, foot is healthy, brace appears to be stabled (sic) at this time patient is discharged (sic) from the practice. Mr. Warren (sic) is ready to travel and no further treatment is necessary at this time."

However, several months later Warden was re-evaluated by Dr. Bazata, who testified that although Warden's foot looked healthy, the left foot continued to turn inward and under. Dr. Bazata indicated that he would need a brace adaptation or the foot would ulcerate again. At this time Dr. Bazata and Warden discussed a below the knee amputation. Warden testified that he felt this drastic move was necessary to prevent the prospect of future infections. Dr. Bazata agreed that a below the knee amputation was a

good medical choice. Warden specifically acknowledged that this was, indeed, his choice under the existent circumstances.

At the time of trial, the amputation had yet to be performed and, clearly, as seen by this Court, Warden's foot remains remarkably deformed.

Dana Marine paid Warden maintenance and cure through April 2006. After that time, they denied further payments alleging that Warden had reached maximum medical cure.

Warden filed suit against Dana Marine asserting claims for maintenance and cure under general maritime law and for damages under the Jones Act. Dana Marine filed a counterclaim arguing that they are entitled to recover payments made to Warden alleging that Warden materially and intentionally misrepresented his medical condition.

**Conclusions of Law**

The Court is now confronted with a determination whether or not Dana Marine's negligence caused Warden's injuries, or that his injuries were caused by the unseaworthiness of M/V ATABOY.

Additionally, this Court is confronted with a determination whether or not Dana Marine properly denied Warden's maintenance and cure; whether he had reached his maximum medical cure; and whether or not Dana Marine is entitled to recover payments made to Warden based upon his alleged intentional concealment or misrepresentation.

And, finally, this Court is confronted with a determination of whether or not Attorney fees are applicable in this case.

### 1. Negligence and Unseaworthiness

The Court finds that Warden has not met his burden of proving that Dana Marine was negligent in causing the un-witnessed incident that occurred on June 3, 2003. Although Dana Marine has taken the position that Warden lied about the incident, there is sufficient evidence to show that something occurred on M/V ATABOY on June 3, 2003, which resulted in the aggravation of Warden's pre-existing condition. However, Warden has not met his burden of proving that Dana Marine was negligent in causing the incident. Furthermore, Warden has not proven that M/V ATABOY was unseaworthy. The alleged existence of the plywood deck was not sufficiently confirmed, and no acceptable evidence was presented by Warden to prove that a plywood deck, even if it had been present, caused the incident.

### 2. Maintenance and Cure

This Court need not re-examine the history and public policy considerations regarding maintenance and cure. Suffice it to say that maintenance and cure is "[a]mong the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors."[1] In Johnson v. Marlin Drilling Co, 893 F2d 77, 79 (5th Cir. 1990), the Fifth Circuit, quoting Aguilar, said, "[T]he broad purposes which maintenance and cure payments are to serve should not be defeated by restrictive and artificial distinctions.... If leeway is to given in either direction, all the considerations which brought

---

[1] See Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 933, 87 L.Ed. 1107 (1943).

the liability into being dictate it should be in the sailor's behalf (citations and internal quotations omitted)." The Court further stated that a determination to terminate a seaman's right to maintenance and cure must be unequivocal. Payments are only to be terminated when the seaman has reached maximum medical cure, which has been determined to be when it appears probable that further treatment will result in no betterment of the condition. *Id* at 79.

The Court finds that Warden is precisely the type of Jones Act seaman for whom this "ancient duty" was designed. Dana Marine had a duty to see that Warden was getting the quality of care he required, and further, that his payments were not terminated until it was unequivocal that no further treatments were required. Warden's foot was shown to the Court during trial, and it is painfully obvious that further treatment, perhaps of a most drastic nature, is required. Warden should have the opportunity to seek a below the knee amputation, however extreme this action may be.

Dana Marine's allegation that Warden should forfeit his payments because he intentionally misrepresented or concealed his condition, is without merit. The evidence showed no intentional concealment by Warden. Furthermore, no connection between any allegedly withheld information and the injury are apparent from this record. *See* McCorpen v. Cent. Gulf S.S. Corp., 396 F.2d 547, 549 (5th Cir.1968); Brown v. Parker Drilling Offshore Corp. 410 F.3d 166, 171(5th Cir. 2005).

**3.  Attorney Fees**

Where the shipowner or employer has arbitrarily refused to provide the disabled seaman with maintenance and cure, the seaman is entitled to recover attorney fees in an action instituted for such failure. *See* <u>Vaughan v. Atkinson,</u> 69 U.S. 527, 82 S.Ct. 997; 8 L.Ed.2d 88. (1962); <u>Lirette v. K&B Boat Rentals, Inc.</u> 579 F.2d 968 (5th Cir. 1978).

In this case the Court finds that Dana Marine denied Warden maintenance and cure for which he was owed, and, accordingly, awards reasonable attorney fees with regard to this aspect of the matters before the Court.

The Court shall allow the parties 30 days from the date of this Order to stipulate the amount of attorney fees due. If by January 15, 2008, such stipulation is not filed, the Court refers the matter to the Magistrate Judge for her report and recommendation.

New Orleans, Louisiana, this 11th day of December, 2007.

Peter Beer
United States District Judge